UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
---------------------------------------------------------------x

SPY PHONE LABS LLC,

                     Plaintiff,

          -v-

GOOGLE, INC. and JOHN DOES 1-50,

                     Defendants.

---------------------------------------------------------------x

No. _____

ECF Case

**COMPLAINT**

Plaintiff Spy Phone Labs LLC ("Plaintiff"), by its undersigned attorneys, for its complaint in this action against defendants Google, Inc. ("Google") and John Does 1-50 (the "Doe Defendants"), alleges as follows:

INTRODUCTION

1.     This action asserts claims under the Lanham Act arising from the Doe Defendants' infringement of Plaintiff's federally registered trademark SPY PHONE® and Google's contribution to such infringement by knowingly permitting the Doe Defendants to infringe on Plaintiff's trademark by and through online marketplaces monitored by Google and over which Google exercises direct control.

2.     This action also asserts claims for all defendants' tortious interference with Plaintiff's prospective economic advantage arising from defendants' intentional and unjustified acts intended to harm Plaintiff's business relationship with prospective customers, including, among other things, the submission of false complaints about Plaintiff and its product, Plaintiff's unjustified suspension from Google's online marketplace in retaliation for submitting legitimate complaints against other developers, and Google's refusal to allow Plaintiff to use its federally registered trademark to identify

its products while allowing other developers to use the trademark in violation of Plaintiff's trademark rights.

PARTIES

3.      Plaintiff Spy Phone Labs LLC is a New Jersey limited liability company with its principal place of business in Wayne, New Jersey.

4.      Upon information and belief, defendant Google, Inc. is a Delaware corporation with its principal place of business in Mountain View, California.

5.      Upon information and belief, the Doe Defendants are developers of software applications used for mobile phones who have infringed upon Plaintiff's federally registered trademark and/or taken action intended to interfere with Plaintiff's prospective business relations.  Plaintiff does not know the true names or legal capacities of the Doe Defendants, and therefore sues these defendants under fictitious names until such time as they can be identified.

JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 insofar as this action asserts claims arising under federal law, namely the Lanham Act.  This Court has supplemental jurisdiction over state and common law claims pursuant to 28 U.S.C. § 1367.

7.      This Court has personal jurisdiction over all defendants in this action because each either does business in New Jersey and/or has sufficient minimum contacts with New Jersey such that maintaining this action in this Court will not offend traditional notions of fair play and substantial justice.

8.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this judicial district.

<u>FACTS ALLEGED</u>

<u>Google and Google Play</u>

9.     Rather than simply provide telephone service, today's mobile "smart" phones offer many features and can perform numerous functions.  Some of these functions and features are installed on the phone by the manufacturer, but many more can be added by the consumer based on his or her needs and interests.

10.     Functions and features can be added to a smart phone by installing or downloading a software application, more commonly known as an "app."

11.     Google owns and operates Google Play, an app distribution platform and online marketplace for smart phones and other electronic devices that operate on the Android$^{®}$ operating system, the operating system installed on close to 50% of all mobile phones in use today.

12.     Google Play enables owners and users of smart phones that operate on the Android$^{®}$ operating system to download apps as well as other electronic media onto their phones.

13.     Google Play also enables a consumer who downloads an app to post a rating from one- to five-stars and to provide specific comments about his or her experience using the app.

14.     Upon information and belief, 90% of all Android$^{®}$-based apps that are downloaded onto a mobile phone are downloaded through Google Play, making

Google Play, far and away, the most dominant and important marketplace for any developer of Android®-based apps.

15.     Upon information and belief, the most common way for consumers to locate an app on Google Play is by entering one or more words into Google Play's search field, which, using an algorithm developed by Google, will generate a list that ranks apps in order of relevance.

16.     Upon information and belief, the name and description of an app are significant factors in determining the ranking of each app in response to a specific word search.

17.     Upon information and belief, the number and quality of consumer reviews that are posted on Google Play is also a significant factor in determining the ranking of each app in response to a specific word search.

18.     Apps that rank higher on the list for a particular search word or term are more likely to be downloaded than lower ranking apps because these are the first apps that consumers see and are likely the most relevant for the consumer.

19.     An app developer who wishes to offer an app for download on Google Play must agree to abide by the policies and procedures established by Google.

20.     Google's developer policies and procedures, among other things, prohibit a developer from infringing or encouraging others to infringe on the intellectual property rights of others, including trademark rights.

21.     Google's developer policies and procedures also prohibit a developer from engaging in any activity that interferes with, disrupts, damages, or accesses in an unauthorized manner the properties or services of any third party.

22.    Google's developer policies and procedures also state that if Google is notified or otherwise becomes aware and determines that a product offered on Google Play violates the intellectual property rights or any other rights of any third party, Google may remove the product from Google Play and reserves the right to suspend and/or bar any developer from Google Play.

23.    Upon information and belief, Google has a group of employees known as the "Google Play Team" whose job responsibilities include ensuring compliance with Google's developer policies and procedures, which they accomplish, among other ways, by investigating complaints and monitoring the content posted in Google Play.

<u>Plaintiff's Trademark, Domain Name and App</u>

24.    Plaintiff is the owner of the federally registered trademark SPY PHONE®, Registration Number 3948486, for computer application software for mobile phones in International Class 09.

25.    Plaintiff's SPY PHONE® trademark has also been registered in Turkey, Mexico, South Korea and Australia under International Registration Number 1169007.

26.    Plaintiff also owns the domain name <spyphone.com>.

27.    Plaintiff is the developer of an app that may be downloaded on a mobile phone that operates on the Android® operating system ("Plaintiff's App").

28.    When downloaded on a mobile phone, Plaintiff's App allows the user or an authorized third party, such as a parent or guardian, to acquire information about how the phone is being used, including the location of the phone through GPS

tracking, the telephone number of the sender or recipient of incoming and outgoing messages, and Internet usage. This information can be accessed through a private account that can be set up through a website operated by Plaintiff and associated with Plaintiff's domain name <spyphone.com>.

29.     Plaintiff generates revenue from Plaintiff's App through advertisements placed on the website associated with <spyphone.com>. As such, the more people who download Plaintiff's app, the more traffic that is driven to Plaintiff's website, and the more money advertisers will pay to advertise on Plaintiff's website.

<u>Plaintiff's App Is Listed on Google Play Under the SPY PHONE® Brand Name</u>

30.     In or around August 2012, Plaintiff established a developer account for Google Play.

31.     At the time Plaintiff established its developer account and at all relevant times since then, there have been dozens and dozens of apps created by different developers listed for download on Google Play that perform the same or similar functions as Plaintiff's App.

32.     After establishing its developer account, Plaintiff initially listed Plaintiff's App for download under the name "SPY PHONE® Phone Tracker," a name that Plaintiff based selected because of its federally registered trademark.

33.     Between August 2012 and June 2013, "SPY PHONE® Phone Tracker" was one of the most popular apps downloaded from Google Play, with over 1.1 million downloads during that period.

34.     Between August 2012 and June 2013, Plaintiff's App had garnered over 4,000 customer reviews, with an average star-rating of 3.9 out of 5.

35.     Upon information and belief, between August 2012 and June 2013, consumers looking for an app that performed the functions offered by Plaintiff's App would specifically search for the phrase "spy phone" on Google Play when looking for Plaintiff's App, which would result in Plaintiff's App being at or near the top of the list generated by Google's algorithm, thereby increasing the likelihood that it would be downloaded by the consumers.

Plaintiff's App Is Removed From Google Play After Plaintiff<br>Complained to Google About Others Infringing on Its Trademark

36.     Upon information and belief, other developers who created apps that performed functions similar to Plaintiff's App, including the Doe Defendants, began to notice the popularity of Plaintiff's App under the SPY PHONE® brand.

37.     In or around May 2013, Plaintiff discovered that several developers, including some of the Doe Defendants, were offering apps for download on Google Play under names that copied or incorporated Plaintiff's SPY PHONE® trademark and that performed the same or similar functions as Plaintiff's App.

38.     After discovering that other developers were infringing on Plaintiff's SPY PHONE® trademark, Plaintiff submitted several trademark infringement complaints to the Google Play Team using Google Play's online complaint form.

39.     The instructions associated with the Google Play's online complaint form state that, when a valid trademark infringement complaint is lodged against another developer, a notice will be sent to that developer stating, among other things, why its app has been removed from Google Play and identifying the name and email address of the person filing the complaint as well as the trademark being infringed.

40.     Although the infringing apps identified in Plaintiff's complaints in May and June 2013 were initially removed from Google Play after the complaints were filed, some of these infringing apps soon reappeared in Google Play, still using or incorporating Plaintiff's registered SPY PHONE® trademark in the name, and with no apparent penalties or repercussions to the infringing developer.

41.     Upon information and belief, none of the developers, including the Doe Defendants, whose apps had names that infringed on Plaintiff's registered SPY PHONE® trademark had their respective Google Play developer account terminated or suspended.

42.     Upon information and belief, in or around June 2013, one or more of the Doe Defendants whose app was removed from Google Play as a result of a trademark infringement complaint submitted by Plaintiff, having learned of Plaintiff's identity from Google, filed false and fraudulent complaints with the Google Play Team asserting that Plaintiff's App violated one or more of Google's developer policies.

43.     Upon information and belief, in or around June 2013, one or more of the Doe Defendants whose app was removed from Google Play as a result of a trademark infringement complaint submitted by Plaintiff filed false and fraudulent consumer reviews on Google Play that were intended to discourage consumer downloads of Plaintiff's App.

44.     On June 28, 2013, Plaintiff was notified by the Google Play Team that, in response to a complaint that it had received, Plaintiff's App had been removed from Google Play and Plaintiff's developer account had been terminated.

45.     The reason given by the Google Play Team for the removal of Plaintiff's App from Google Play was that it violated Google's "spyware" policy, which prohibits, among other things, "apps that collect information (such as the user's location or behavior) without the user's knowledge (spyware)."

46.     Google knew or should have known that Plaintiff's App did not violate any of Google's developer policies, including the spyware policy, and that any complaints the Google Play Team received about Plaintiff's App were false or fraudulent.

47.     Plaintiff appealed the decision to remove Plaintiff's App from Google Play and terminate its developer account, providing several reasons why Plaintiff's App did not violate Google's spyware policy.  Among the reasons given was that Plaintiff's App, unlike "hidden" apps offered by other developers, caused a notification to appear on the mobile phone on which Plaintiff's App was downloaded, such that Plaintiff's App could not be used to obtain data from the phone without the user's knowledge.

48.     Google denied Plaintiff's appeal and initially refused to reinstate Plaintiff's developer account.

49.     Following the denial of Plaintiff's appeal, representatives of Plaintiff had extensive discussions with Google and its counsel in an attempt to have Plaintiff's developer account reinstated so that Plaintiff's App could again be offered on Google Play.

50.     After weeks of negotiations that continued throughout the summer and early fall of 2013, Google informed Plaintiff that the Google Play Team was satisfied with the notification and other features of Plaintiff's App, but that Plaintiff's developer

account would be reinstated and Plaintiff's App could be returned to Google Play only if Plaintiff stopped using the brand name SPY PHONE® to identify Plaintiff's App.

51.     According to the Google Play Team, Plaintiff's use of the brand name SPY PHONE®, in and of itself, violated the "dangerous products" provision of Google's developer policies because it was misleading and/or suggested that Plaintiff's App could be used for spying:

> While providing additional disclosure in the app description and regular notification to targeted phones are crucial steps to accomplishing policy compliance, the Google Play Team believes the app is still in violation of policy because of the app's title. App titles should not be misleading or represent the product as being spyware and/or capable of surreptitious tracking [emphasis added].

52.     In response to Google demand that Plaintiff stop using the brand name SPY PHONE®, Plaintiff's counsel brought to Google's attention that not only did Plaintiff have a federally registered trademark for the brand name SPY PHONE®, there were currently dozens of other apps being offered for download that contained the word "spy" in the title:

> We do not understand Google Play's concern over the name of my client's app when there are dozens of other apps that perform the same or a similar function on Google Play that use the word "spy" in its name, including several that use my client's trademarked phrase "spy phone."  I invite you do to as I did just a few minutes ago and enter the phrase "spy phone" into the Google Play search bar and you will see what I mean.

53.     The Google Play Team indicated developers were no longer was going to be permitted to use "spy" in the name of their apps, and insisted that Plaintiff's must stop using the SPY PHONE® trademark if Plaintiff wanted to have its developer account reinstated.

54.     Although Plaintiff believed that Google's developer policies, as written, did not require Plaintiff to stop using its registered SPY PHONE® trademark in the name of Plaintiff's App, based on the discussions with Google, Plaintiff believed that prohibition against using the word "spy" in the title of an app would be universally applied to all developers and, therefore, would create a level playing field with respect to all developers who offered apps for download on Google Play that performed functions similar to Plaintiff's App.

55.     Given its belief that the playing field would be level and Google Play's position as the most dominant and important marketplace for Android®-based apps, Plaintiff acceded to Google's demand to change the name of Plaintiff's App.

#### While Plaintiff Changes the Name of Its App, Google Allows Other Developers To Offer Apps That Use "Spy" in the Name And To Infringe on Plaintiff's Trademark

56.     On or about October 2013, Google reinstated Plaintiff's developer account, but only after deleting the content relating to all versions of Plaintiff's App, including all the consumer reviews and records of downloads for Plaintiff's App appearing under the brand name SPY PHONE®.

57.     Prior to the termination of its developer account, Plaintiff had spent thousands of staff hours on updating Plaintiff's App, responding to customer service inquiries and reviews about Plaintiff's App and other activities in order to keep Plaintiff's App at or near the top of the rankings for phone tracking apps, all of which was lost when Google terminated Plaintiff's developer account.

58.     Soon after its developer account was reinstated, Plaintiff began offering Plaintiff's App for download on Google Play under the name "Phone Tracker."

59.     Due to the loss of its unique brand name and the thousands of positive customer reviews, the number of downloads for Plaintiff's App under the name "Phone Tracker" plummeted to approximately 260,000 for the ten-month period between October 2013 and July 2014, as compared to more than 1.1 million for the ten-month period between August 2012 and June 2013 when Plaintiff's App had used the SPY PHONE® brand.

60.     Meanwhile, from the date Plaintiff's developer account was terminated in June 2013 to date, dozens of other developers, including the Doe Defendants, have continued to offer apps that perform the same or similar functions on Google Play and that use the word "spy" in the name or description, including several that use or have used Plaintiff's SPY PHONE® trademark.

61.     Based on regular monitoring of the content on Google Play by members of the Google Play Team, Google is or should be aware of all apps have either used or incorporated Plaintiff's SPY PHONE® trademark in the name or otherwise used the word "spy" in its name, but Google has failed to take any action to remove offending apps from Google Play or suspend, terminate or otherwise punish the developers of the offending apps, including the Doe Defendants.

62.     Alarmed that Google was taken no action against developers who continued to infringe on Plaintiff's trademark and otherwise used the word "spy" in the name of an app, starting in or around January 2014, Plaintiff began submitting complaints to the Google Play Team about apps offered for download by developers, including the Doe Defendants, who infringed on Plaintiff's SPY PHONE® trademark.

63. Rather than submit trademark infringement complaints, however, Plaintiff submitted complaints asserting that, by using the word "spy" in the name, these apps were violating Google's spyware policy, the same policy cited by the Google Play Team when they terminated Plaintiff's account in June 2013.

64. Unlike a trademark infringement complaint, which requires disclosure of the complainant's identity, a complaint asserting a violation of Google's spyware policy did not require Plaintiff's identity to be revealed to the developer against whom the complaint was lodged.

65. Plaintiff also submitted other complaints asserting violations of Google's spyware policy against developers who were not infringing on Plaintiff's registered SPY PHONE® trademark, but were nonetheless using the word "spy" in the name of the app.

66. In addition to the specific complaints sent to the Google Play Team by Plaintiff during 2014, as a result of the Google Play Team's regular monitoring of the content on Google Play, Google know or should have known that there were other developers, including the Doe Defendants, who were offering apps for download on Google Play with names that either infringed on Plaintiff's registered SPY PHONE® trademark or contained the word "spy" in the name or description.

67. On several occasions, no action was taken on Plaintiff's complaints to the Google Play Team, which meant that the offending app was either never removed from Google Play or Plaintiff had to send multiple complaints before an app using Plaintiff's registered trademark SPY PHONE® or the word "spy" in the name was removed from Google Play.

68.     Further, on several occasions when apps were removed from Google Play by the Google Play Team, the same apps would reappear in Google Play a short time later without any apparent penalties or repercussions to the developer, including the Doe Defendants.

69.     Upon information and belief, Plaintiff was the only app developer who had its developer account terminated or suspended for offering an app for download on Google Play that used the word "spy" in the name, notwithstanding the fact that Plaintiff owns a registered trademark for SPY PHONE®.

   Plaintiff's Additional Complaints Lead To a Second Suspension From Google Play

70.     In or around June 2014, Plaintiff submitted a complaint to the Google Play Team about an app offered for download on Google Play that used the word "spy" in its name.

71.     The developer of this particular app was among the developers about whom Plaintiff had submitted a trademark infringement complaint in May or June 2013, shortly before Plaintiff had its developer account terminated in June 2013.

72.     On or around July 16, 2014, Plaintiff was notified by the Google Play Team that its developer account was being suspended and that Plaintiff's App was again being removed from Google Play for violation of Google's "spam" policy.

73.     Google's spam policy prohibits the sending of SMS, email, or other electronic messages on behalf of the user without providing the user with the ability to confirm the content and intended recipient.

74.     Plaintiff's App did not perform any functions that violated Google's spam policy.

75.     The complaint(s) that led to Plaintiff's developer account being suspended in July 2014 for violation of Google's spam policy was/were false and/or fraudulent and, upon information and belief, submitted by one or more of the Doe Defendants.

76.     Google knew or should have known that the complaint(s) the led to Plaintiff's suspension for violating Google's spam policy was false and/or fraudulent.

77.     Plaintiff appealed Google's determination that Plaintiff's App violated Google's spam policy, but that appeal was denied.

78.     Approximately 30 days after its developer account was suspended, Plaintiff received an anonymous letter from a person who identified him/herself as a "concerned" member of the Google Play Team.  The author stated that "there was no real justification" for either the 2013 termination of Plaintiff's developer account or the 2014 suspension, and that such actions were intended to punish Plaintiff for using the brand name SPY PHONE® and filing complaints to enforce its trademark rights, and that the so-called "policy" against using the word "spy" in the name of an app was being enforced against no one other than Plaintiff.

79.     The author further stated many Google employees either develop their own apps or have side deals with developers who have apps that compete with Plaintiff's App, and that these employees had orchestrated the removals of Plaintiff's App from Google Play because it was successful and cut into the profits of the other developers.

80.     After receiving this letter, Plaintiff's counsel notified Google in writing that Plaintiff's registered SPY PHONE® trademark continues to be infringed by

other developers offering apps for download on Google Play, that Google has no right to prohibit Plaintiff from using its registered SPY PHONE® trademark as the brand name of Plaintiff's App, and demanded that Google take action to prevent further infringement of Plaintiff's trademark and investigate the circumstances surrounding Plaintiff's 2013 termination and 2014 suspension.

81.     Google did not respond to this demand.

82.     To this day, Google Play continues to offer apps for download that infringe on Plaintiff's registered SPY PHONE® trademark and/or use the word "spy" in the name.

83.     Moreover, since September 2014, Plaintiff has submitted numerous complaints to the Google Play Team with respect to apps offered for download on Google Play that perform the same functions as Plaintiff's app on the ground that these apps violated Google's spam policy, which was the same policy on which the Google Play Team relied when Plaintiff's developer account was suspended in July 2014.

84.     Upon information and belief, the Google Play Team has not removed any app or suspended any developer in response to Plaintiff's complaints asserting violations of Google's spam policy.

Google Further Rewards Developers Who Infringe on Plaintiff's SPY PHONE®
Trademark By Given Them Priority Ranking in Google's Search Engine Results

85.     Separate from its Google Play marketplace for downloading apps and electronic media, Google owns and maintains a widely-used Internet search engine (the "Search Engine").

86.     Prior to June 2014, when a person used Google's Search Engine on a mobile phone that runs on the Android® operating system, advertisers who paid to have

16

their name associated with a particular search word or phrase were displayed first, followed by the "natural" search results, which are ranked in order of relevance by a proprietary algorithm owned by Google.

87.    Google exercises full and complete control over how the results are displayed following a particular search on its Search Engine.

88.    Since in or around January 2013 until in or around June 2014, Plaintiff's website <spyphone.com>, which corresponds to Plaintiff's registered SPY PHONE® trademark, was the first to appear on the natural results list, directly below paid advertisers, whenever a person conducted a search for the phrase "spy phone" using Google's Search Engine on an Android® mobile phone.

89.    Starting in or around June 2014, Google changed the way in which the results are displayed when using Google's Search Engine on an Android® mobile phone by listing the top-ranked apps on Google Play directly below the paid advertisers and ahead of all natural Search Engine results.

90.    As a result, since in or around June 2014, if a consumer searches the phrase "spy phone" on an Android® mobile phone using Google's Search Engine, the top-ranked apps that appear on Google Play word search for "spy phone" now appear before Plaintiff's website associated with <spyphone.com>.

91.    At all relevant times since June 2014, the top-ranked app that appears on Google Play has been one that infringes on Plaintiff's registered SPY PHONE® trademark.

92.    Google is or should be aware that, since June 2014, the top-ranked app for the word search "spy phone" on Google Play uses a name that infringes on Plaintiff's registered SPY PHONE® trademark.

93.    As a result of Google's failure to take action against developers who offer apps on Google Play that infringe on Plaintiff's registered SPY PHONE® trademark, Plaintiff's Internet visibility and profits have diminished, while developers, including the Doe Defendants, who offer apps for download on Google Play with names that infringe on Plaintiff's SPY PHONE® trademark have enjoyed increased visibility.

<u>AS AND FOR A FIRST CAUSE OF ACTION</u>
(Trademark Infringement Against the Doe Defendants)

94.    Plaintiff repeats and realleges the foregoing paragraphs of the complaint as if fully set forth herein.

95.    Under § 43(a) of the Lanham Act, 15 U.S.C. § 1114(a), any person who uses in commerce any word, term or name or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

96.    Since at least May 2013, the Doe Defendants, individually and/or collectively, have offered and continue to offer apps for download on Google Play under the name SPY PHONE®.

97.     The acts of the Doe Defendants, as described above, infringe on Plaintiff's federally registered SPY PHONE® trademark in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1114(a).

98.     As a proximate result of the Doe Defendants' infringing actions, Plaintiff has suffered and will continue to suffer damage to its business, goodwill, reputation, profits and the strength of its SPY PHONE® trademark.

99.     An award of monetary damages alone cannot fully compensate Plaintiff for its injuries and Plaintiff lacks an adequate remedy at law.

100.    The Doe Defendants' acts of infringement have been and continue to be deliberate, willful and wanton, making this an exceptional case within the meaning of 15 U.S.C. § 1117.

101.    Plaintiff is entitled to a preliminary and permanent injunction against the Doe Defendants, as well as all other remedies available under the Lanham Act, including, but not limited to statutory damages, compensatory damages, treble damages, disgorgement of profits, costs and attorneys' fees.

### AS AND FOR A SECOND CAUSE OF ACTION
(Contributory Trademark Infringement Against Google)

102.    Plaintiff repeats and realleges the foregoing paragraphs of the complaint as if fully set forth herein.

103.    Google has direct control over the operations of Google Play.

104.    Google has the ability to monitor the content posted on Google Play and does, in fact, regularly monitor the content posted on Google Play to ensure compliance with Google's policies and procedures.

105.    The Doe Defendants have utilized Google Play to infringe on Plaintiff's federally registered SPY PHONE® continuously and repeatedly since at least May 2013.

106.    Google knew or had reason to know that the Doe Defendants have utilized Google Play to infringe on Plaintiff's federally registered SPY PHONE® trademark continuously and repeatedly at least since May 2013

107.    Despite knowledge of infringement by the Doe Defendants, Google continued to supply its services to the Doe Defendants by allowing the Doe Defendants to offer apps for download on Google Play with names that infringe on Plaintiff's federally registered SPY PHONE® trademark.

108.    At the same time, Google failed and/or refused to suspend the developer accounts of the Doe Defendants or take any other penal action when such trademark infringement was reported or otherwise discovered.

109.    Google's actions are willful and with actual knowledge that the Doe Defendants have used and are continuing to use Google Play as an instrumentality to engage in direct trademark infringement of Plaintiff's federally registered SPY PHONE® trademark.

110.    Not only has Google refused to take action against the Doe Defendants who are infringing on Plaintiff's federally registered SPY PHONE® trademark, Google has further rewarded such infringement by given apps offered by the Doe Defendants on Google Play increased visibility to consumers who search the phrase "spy phone" on an Android® mobile phone using Google's Search Engine.

111.   Google's acts and omission as described above constitute contributory trademark infringement.

112.   As a proximate result of the Google's actions or failure to act, Plaintiff has suffered and will continue to suffer damage to its business, goodwill, reputation, profits and the strength of its SPY PHONE® trademark.

113.   An award of monetary damages alone cannot fully compensate Plaintiff for its injuries and Plaintiff lacks an adequate remedy at law.

114.   Google's acts of contributory infringement have been and continue to be deliberate, willful and wanton, making this an exceptional case within the meaning of 15 U.S.C. § 1117.

115.   Plaintiff is entitled to a preliminary and permanent injunction against Google, as well as all other remedies available under the Lanham Act, including, but not limited to statutory damages, compensatory damages, treble damages, disgorgement of profits, costs and attorneys' fees.

<u>AS AND FOR A THIRD CAUSE OF ACTION</u>
(Tortious Interference With Prospective Economic Advantage Against All Defendants)

116.   Plaintiff repeats and realleges the foregoing paragraphs of the complaint as if fully set forth herein.

117.   Plaintiff has a protectable right in its relationship with prospective customers who wish to download Plaintiff's App.

118.   The Doe Defendants, intentionally and without justification or excuse, interfered with Plaintiff's relationship with its prospective customers by taking the actions described above, which include, among other things, offering apps for download on Google Play with names that infringe on Plaintiff's SPY PHONE®

trademark, submitting false and fraudulent complaints to the Google Play Team about Plaintiff's App with the intention of having Plaintiff's App removed from Google Play, and submitting false and fraudulent consumer reviews with the intention of discouraging consumers from downloading Plaintiff's App.

119. Google, acting by and through its employees on the Google Play Team, intentionally and without justification or excuse, interfered with Plaintiff's relationship with its prospective customers by taking the actions described above, which include, among other things, prohibiting Plaintiff from offering Plaintiff's App for download on Google Play under the brand name SPY PHONE®, terminating and/or suspending Plaintiff's developer account without justification and at the behest of developers who compete with Plaintiff, and failing to suspend, terminate or take other penal action against developers who have repeatedly and continuously infringed on Plaintiff's SPY PHONE® trademark.

120. As a proximate result of defendants' interference with Plaintiff's relationship with prospective customers, Plaintiff experienced a significant reduction in the number of consumers who downloaded Plaintiff's App and a significant reduction in revenue.

121. In addition to economic damages, Plaintiff has suffered and will continue to suffer irreparably harm to its business that is being proximately caused by defendants' actions as described above, for which Plaintiff has no adequate remedy at law.

122. Plaintiff is entitled to damages for past and present harm as well as injunctive relief to restrain defendants from interfering with its business.

<u>JURY DEMAND</u>

123.    Plaintiff demands a trial by jury on all issues so triable.

WHEREFORE, Plaintiff demands judgment as follows:

A.      on all counts, awarding Plaintiff a preliminary and permanent injunction: (i) that restrains and enjoins defendants, their agents, servants, employees, and all other persons in privity or acting in concert, from engaging in any conduct that infringes on Plaintiff's SPY PHONE® trademark, contributes to the infringement of Plaintiff's SPY PHONE® trademark by others and/or interferes with Plaintiff's rights to do business with prospective customers, and (ii) that compels Google to allow Plaintiff to use its SPY PHONE® trademark on Google Play and restore all deleted customer reviews and other information associated with Plaintiff's App;

B.      on all counts, awarding Plaintiff damages that it has sustained as a consequence of defendants' conduct as described herein and, with respect to any damages awarded under claims brought under the Lanham Act, the trebling of all such damages pursuant to 15 U.S.C. § 1117 or, alternatively and at its election, an award of statutory damages pursuant to 15 U.S.C. § 1117 of up to $2,000,000 for willful infringement and/or contributing to the willful infringement of Plaintiff's SPY PHONE® trademark;

C.      on all claims brought under the Lanham Act, awarding Plaintiff reasonable attorneys' fees pursuant to 15 U.S.C. § 1117;

D.      awarding Plaintiff the costs of this action and pre-judgment interest; and

E.      for such other and further relief as the Court deems just and proper.

Dated: October 22, 2014

GREENBERG FREEMAN LLP

By:    /s/ *Michael A. Freeman*
   Michael A. Freeman (MF-9600)
   110 East 59th Street, 22nd Floor
   New York, New York  10022
   (212) 838-3121
   Attorneys for Plaintiff