<u>NOT FOR PUBLICATION</u>

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

_____
                                    :
**SPY PHONE LABS LLC,**              :
                                    :
      *Plaintiff,*           :   Civil Action No. 14-6565
                                    :
v.                                  :   OPINION
                                    :
**GOOGLE, INC.,**                    :   August 13, 2015
**ANDREI CIUCA, d/b/a CAD DESIGN,**  :
**and JOHN DOES 1-49**               :
                                    :
      *Defendants*.          :
_____ :

**ARLEO, UNITED STATES DISTRICT JUDGE.**

    Before the Court is Defendant Google, Inc.'s ("Google") motion to transfer this case to the Northern District of California or to dismiss the First Amended Complaint (the "FAC") [Dkt. No. 18]. The Court did not hear oral argument pursuant to Fed. R. Civ. P. 78 and L. Civ. R. 78.1. For the reasons set forth below, Google's motion to transfer is **GRANTED**.

**I.    BACKGROUND**

    Plaintiff Spy Phone Labs LLC ("Plaintiff") is the owner of the federally registered trademark SPY PHONE®, Registration Number 3948486. Dkt. No. 17, FAC ¶ 29. Plaintiff developed a mobile app ("the App") that operated on Google's Android® operating system. Id. ¶ 32. The App was a parental monitoring app that allowed an authorized third party, such as a parent or guardian, to monitor the use of the phone through a secure website ("the Website"). Id. ¶¶ 33-34. While the App was free to the user, it generated revenue through advertisements on the Website, using a Google-operated program called Adsense. Id. ¶ 37.

In order to distribute the App, Plaintiff made it available for download through Google Play, an online app market hosted by Google. Id. ¶¶ 42, 44. Plaintiff agreed to Google's developer agreement (the "DDA"), in order to make the App available for download on Google Play. See id. ¶ 20. The DDA contained various terms and restrictions, including a forum selection clause that required Plaintiff to submit to the exclusive jurisdiction of the courts within Santa Clara, California. Woodward Decl., Ex. A § 15.7. In addition, Google reserved the right to take down apps that infringed on another's intellectual property, contained spyware (spyware collects information from an unknowing user and sends it to an unauthorized third party), or for other reasons. FAC ¶ 26; see also Woodward Decl., Ex. A § 7.2. The DDA also contained a liability limitation provision, absolving Google of liability for direct, indirect, or incidental damages incurred by Plaintiff. Woodward Decl., Ex. A § 12.

Plaintiff began distributing the App in August 2012, titling it "SPY PHONE," and ensured the App complied with all of the DDA's terms by restricting transmission of a user's information to its authorized website. FAC ¶¶ 35-36. For the first ten months, the App generated over 1.1 million downloads, which increased traffic to the Website, which in turn increased advertising revenue. Id. ¶¶ 46-47.

Beginning in November 2012, other apps, allegedly developed by the Doe Defendants, began to incorporate Plaintiff's trademarked name, and performed the same basic functions as Plaintiff's app. Id. ¶ 48. Between November 2012 and May 2013, Plaintiff lodged trademark infringement complaints with Google, and Google removed a number of infringing apps, notifying the Doe Defendants of the reasons for removal. Id. ¶¶ 50-51.

In June 2013, Plaintiff received an email from "Ciuca," a developer of one of the removed apps, asking for an explanation for removal; Plaintiff responded that Ciuca infringed on its

2

trademark. Id. ¶¶ 55-56. Later that month, Plaintiff requested that Google remove the Reptilicus.net Brutal Spy Phone app ("Brutal App") from its online store. Id. ¶ 58. Google did not remove the Brutal App, claiming that it could not determine if Brutal App infringed Plaintiff's trademark. Id. ¶ 59. Shortly thereafter, Google removed Plaintiff's App from Google Play, claiming that the App violated Google's anti-spyware policy. Id. ¶¶ 60-61. Though Google denied an initial appeal, Google later agreed to reinstate Plaintiff after lengthy communications between the parties. Id. ¶ 68-69, 72, 77. In these discussions, Google did not claim the App's functionality actually constituted spyware, but the very use of the word "spy" in the App's name violated Google's policies. Id. ¶ 73. Plaintiff responded that its federally-registered trademark contained the word "spy" and noted that a number of other apps still for sale of Google Play included the word "spy" in their titles. Id. ¶ 74. Google represented that, going forward, all developers would be prohibited from using the word "spy," which Google claimed would "level the playing field" for all developers with parental monitoring apps. Id. ¶¶ 74-75. Based upon Google's representations, Plaintiff agreed to stop using the name "SPY PHONE" to identify the App, renaming it "Phone Tracker." Id. ¶¶ 76-78. Upon reinstatement on Google Play, the App's downloads dropped to 260,000 downloads, from 1.1 million downloads, over the next ten months, which resulted in a steep reduction in advertising revenue. Id. ¶¶ 79-80.

At the same time its revenues were shrinking, other developers, including Ciuca and the Doe Defendants, continued to use the term "spy" in their apps' names. Id. ¶¶ 81-84. Plaintiff began submitting to Google spyware complaints against these developers, based upon the same anti-spyware policy that Google relied upon to remove "SPY PHONE" from Google Play. Id. ¶¶ 90-91. On July 2014, Plaintiff lodged one such spyware complaint against a developer it suspected to be Ciuca. Id. ¶¶ 91-92. Two days later, Google notified Plaintiff that it was suspending

3

Plaintiff's account due to violation of Google's spam policy, which prohibits the sending of electronic messages on behalf of a user without providing the user with the ability to confirm the content of the message.  Id. ¶¶ 24, 93.  Plaintiff alleges the App does not violate this policy and Google knew Ciuca, or one of the Doe Defendants, falsely filed the spam complaint.  Id. ¶¶ 95-97.  Shortly after its suspension, Ciuca listed a parental monitoring app on Google Play called "Spy Phone App Parental Control."  Id. ¶ 98.  Google took no action against Ciuca for violating its policies or Plaintiff's trademark.  Id. ¶ 99.

About thirty days after being suspended, Plaintiff received a letter from an anonymous employee of Google claiming Google was treating Plaintiff unfairly and there was no justification for the adverse actions taken against it.  Id. ¶¶ 103-04.  The letter also stated that many of Google's employees act in ways to enhance the income of their own apps, or friends' apps, and orchestrated the App's removal from Google Play.  Id. ¶ 106.

According to Plaintiff, Google knew, or should have known, about the infringement of Plaintiff's trademark due to the relative ease with which infringements can be discovered.  Id. ¶ 114.  Google has also not responded to a letter from Plaintiff's counsel requesting Google take action against the infringers.  Id. ¶¶ 116-17.

Plaintiff's Complaint contains three causes of action: (1) Trademark Infringement against Ciuca and the Doe Defendants; (2) Contributory Trademark Infringement against Google; and (3) Tortious Interference with Prospective Economic Advantage against Google, Ciuca, and the Doe Defendants.  Plaintiff does not allege breach of the DDA.

## II.     MOTION TO TRANSFER PURSUANT TO 28 U.S.C. § 1404

### A.  Standard of Review

In a typical case not involving a forum-selection clause, the district court must, in considering a Section 1404(a) motion, weigh the relevant private and public-interest factors and determine whether a transfer would serve "the convenience of parties and witnesses" and otherwise promote "the interest of justice." 28 U.S.C. § 1404(a); Jumara v. State Farm Ins. Co., 55 F.3d 873, 879 (3d Cir. 1995). When, however, the parties have agreed to a valid forum selection clause, the court's analysis is significantly different. Specifically, the parties' choice of forum should "be given controlling weight in all but the most exceptional cases," requiring federal district courts, in turn, "to adjust their usual § 1404(a) analysis in three ways." Atl. Marine Constr. Co., Inc. v. U.S. Dist. Ct. for W. Dist. of Tx., 134 S. Ct. 568, 581 (2013). "First, the plaintiff's choice of forum merits no weight, and instead, the plaintiff "bears the burden of establishing that transfer" to the agreed-upon forum would be "unwarranted." Id. Second, the parties "waive the right to challenge the preselected forum as inconvenient or less convenient for themselves or their witnesses, or for their pursuit of the litigation." Id. Thus, the Court must "deem the private-interest factor to weigh entirely in favor of the preselected forum." Id. at 582. Third, when a party "flouts" its contractual obligation under the forum selection clause, "a § 1404(a) transfer of venue will not carry with it the original venue's choice-of-law rules—a factor that in some circumstances may affect public-interest considerations." Id.

**B. Analysis**

Here, Plaintiff does not challenge the forum selection clause's validity, but instead argues that its claims do not fall within the clause's scope. See Vulcan Capital Corp. v. Miller Energy Res., Inc., No. 13-8751, 2014 WL 4384159, at *3 (S.D.N.Y. Sept. 4, 2014) (the Court must first determine whether forum selection clause applies to the matters at issue in the litigation). "The question of the scope of a forum selection clause is one of contract interpretation." John Wyeth &

5

Bro. Ltd. v. CIGNA Int'l Corp., 119 F.3d 1070, 1073 (3d Cir. 1997). The DDA's forum selection clause reads:

> You and Google agree to submit to the exclusive jurisdiction of the courts located within the county of Santa Clara, California to resolve any legal matter arising from this Agreement.

Agreement § 15.7 (emphasis added). The question before the Court is whether the language of this clause is sufficiently broad to bring Plaintiff's claims for tortious interference with prospective economic advantage and contributory trademark infringement within its ambit.

In deciding this issue, the Court looks to cases involving forum selection clauses with language similar to the "arising from" language quoted above. Id. Thus, cases involving a forum selection clause employing language such as "related to" or "in relation to" are inapposite because such clauses are decidedly broader in scope. See id. at 1075.[1] A claim "arises from" a contract where it can be said "to originate from" the contract. Phillips v. Audio Active, Ltd., 494 F.3d 378, 390 (2d Cir. 2007). This generally requires that the claim bear a causal connection to the contract. Id. at 389; see also Nubenco Enters., Inc. v. Inversiones Barbarena, S.A., 963 F. Supp. 353, 362-63 (D.N.J. 1997) (holding that forum selection clause governing "[a]ny dispute arising from this agreement" was "one of limited authority").

Here, it is clear that Count III for tortious interference originates from the DDA. To state a claim for tortious interference with prospective economic advantage, a plaintiff must allege: "(1) a reasonable expectation of economic advantage to plaintiff, (2) interference done intentionally and with 'malice,' (3) causal connection between the interference and the loss of prospective gain,

---

[1] Because Parts Geek, LLC v. U.S. Auto Parts Network, Inc., No. 09-5578, 2010 WL 1381005 (D.N.J. Apr. 1, 2010), concerned a clause using "in relation to" language, Google's reliance on that case is misplaced.

6

and (4) actual damages." Varrallo v. Hammond Inc., 94 F.3d 842, 848 (3d Cir. 1996) (citing Printing Mart-Morristown v. Sharp Elecs. Corp., 116 N.J. 739, 751 (1989)).

Here, Plaintiff alleges that:

Google … interfered with Plaintiff's relationship with its prospective customers by … prohibiting Plaintiff from offering Plaintiff's App for download on Google Play under the brand name SPY PHONE®, terminating and/or suspending Plaintiff's developer accounts without justification and at the behest of developers who compete with Plaintiff, and failing to suspend, terminate or take other penal action against developers who have repeatedly and continually infringed on Plaintiff's SPY PHONE® trademark."

Am. Compl. ¶ 147 (emphasis added). Plainly, Plaintiff was only able to offer its App for download on Google Play because it accepted the DDA. Plaintiff's damages due to the loss of downloads therefore arise from the contract. As pled, Plaintiff's "reasonable expectation of economic benefit or advantage" originates directly from the DDA and Google's failure to perform its obligations thereunder. See Dkt. No. 18-5, DDA ¶ 7.2. The Court is therefore satisfied that Count III "arises under" the DDA.

The Court cannot reach a similar conclusion with respect to contributory trademark infringement as alleged in Count II. A claim for contributory trademark infringement requires the establishment of two elements: "(1) supply of a product, and (2) knowledge of direct infringement." Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc., 42 F.3d 1421, 1432 (3d Cir. 1994) (internal quotations and citations omitted).

As to the first element, whether Google supplied infringing products has nothing at all to do with the DDA. Similarly, whether Google had knowledge that those apps were infringing on Plaintiff's trademark is not dependent upon any rights or obligations of the parties under the DDA. While Google's knowledge appears based at least in part on the repeated trademark infringement complaints that Plaintiff lodged with Google pursuant to the DDA, and while Google may attempt

7

to invoke the DDA as a defense to Plaintiff's claims, the test is solely whether Plaintiff's trademark rights originate from the DDA. As Plaintiff's infringement claim could exist in the DDA's absence, it is clear that Plaintiff's rights do not arise from the DDA. See Philips v. Audio Active, Ltd, 494 F. 3d 378, 390 (2d Cir. 2007) (declining to enforce a forum selection clause with respect to statutory copyright claims, since those claim exist independently of any contractual rights); Altvater Gessler-J.A. Baczewski Int'l (USA) Inc. v. Sobieski Destylarnia S.A., 572 F.3d 86, 91 (2d Cir. 2009) (finding that trademark infringement claims were not covered by a similar forum selection clause because the claims "[did] not sound in contract and [were] not based on rights originating from" the contracts at issue).

Thus, one claim arises under the DDA and one does not. Where some claims are subject to a forum selection clause and others are not, it will sometimes be appropriate, in the interest of judicial efficiency, to sever the claims subject to the clause and transfer them to the preselected forum. See In re Rolls Royce Corp., 775 F.3d 671, 679-83 (5th Cir. 2014); White v. ABCO Engineering Corp., 199 F.3d 140, 144-45 (3d Cir. 1999). Here, however, the severance and transfer of only Count II to the Northern District of California would not serve the interest of judicial efficiency. First, discovery relating to both claims will likely overlap because the factual basis for both is the same. Moreover, because Plaintiff brings its tortious interference claim against all defendants, this is not a case where a severance and partial transfer would apply only to certain parties. Considerations of judicial economy therefore clearly counsel against severance and transfer of only that claim. See Sunbelt Corp. v. Noble, Denton & Assocs., Inc., 5 F.3d 28, 33 (3d Cir. 1993) (partial transfer inappropriate where it "would require the same issues to be litigated in two places" (internal quotations omitted)). Furthermore, with respect to the private interest factors, the presence of the forum selection clause—at least as to the tortious interference claim—militates

8

entirely in favor of transfer.  See Rolls Royce, 775 F.3d at 679 (citing Atlantic Marine, 134 S. Ct. at 581-82).  In consideration of these factors, the Court is convinced that transfer of this entire action to the Northern District of California is appropriate here.

### III.   CONCLUSION

In light of the foregoing, Google's motion to transfer is **GRANTED**.  An appropriate order will follow.

*s/ Madeline Cox Arleo*
**HON. MADELINE COX ARLEO**
**UNITED STATES DISTRICT JUDGE**